**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

ABO PETROLEUM, INC.,

      Plaintiff,

v.                                                                  Case No. 04-CV-72090-DT

COLONY INSURANCE COMPANY,

      Defendant.

_____/

**OPINION AND ORDER GRANTING DEFENDANT'S "MOTION TO AMEND
SCHEDULING ORDER AND FOR LEAVE TO FILE SECOND AMENDED ANSWER,"
GRANTING DEFENDANT'S "MOTION FOR SUMMARY JUDGMENT," AND
DENYING PLAINTIFF'S "MOTION FOR SUMMARY JUDGMENT"**

Pending before the court are three motions in the above-captioned matter: (1)

Defendant's November 30, 2004 "Motion to Amend Scheduling Order and for Leave to

File Second Amended Answer;" (2) Defendant's November 30, 2004 "Motion for

Summary Judgment;" and (3) Plaintiff's December 1, 2004 "Motion for Summary

Judgment."  The court held a hearing on March 9, 2005, and for the reasons set forth

below, will grant Defendant's motions and deny Plaintiff's motion.

**I.  BACKGROUND**

This is a breach of contract case where the parties dispute whether insurance

coverage exists.  Plaintiff ABO Petroleum ("ABO") alleges that Defendant Colony

Insurance Company ("Colony") breached an insurance contract between the parties by

refusing to pay "corrective action costs" that Plaintiff has incurred in correcting a

gasoline spill or leak from a tank storage system at Plaintiff's gas station.  Plaintiff's

proposed expert estimates the total corrective action costs will be between $247,000.00

and $305,000.00.  (Def.'s Mot. Br. Ex. P (Thomas M. Kenney Report at Table 2).)

ABO, a Michigan corporation, operates a Sunoco-branded gasoline service

station at 19036 Dix Street in Melvindale, Michigan.  ABO purchased two insurance

policies related to storage tank pollution from Defendant Colony, a Virginia corporation.

The second policy, commencing January 14, 2003 is relevant to this dispute.  Plaintiff

ABO initially filed suit in Wayne County Circuit Court on May 11, 2004.  Defendant

removed the case to this court and federal subject matter jurisdiction is predicated on

diversity jurisdiction under 28 U.S.C. § 1332.

### A.  The Insurance Policy

In January 2003, Plaintiff purchased a Storage Tank Pollution Liability Policy from

Defendant for a $2,869.00 premium.  (Def.'s Mot. Br., Ex. E.)  The original policy term

was from January 14, 2003 through January 14, 2004 and it covered the facility and

storage tank system (including 4 underground tanks) at 19036 Dix Street.  (*Id.*)  The

"Storage Tank Pollution Liability Policy" was a claims made policy and Plaintiff opted for

a basic form of coverage which limited recovery under "confirmed release coverage."

The basic form of coverage selected is set forth in the "Confirmed Release Coverage

Endorsement," (Form EO14BASIC 12/00).  This endorsement replaces Section I found

in the seven-page "Storage Tank Pollution Liability Policy" (PP 07/01), but all other

terms and conditions of Colony's standard seven-page policy remained unchanged.

(*See* Def.'s Mot. Br., Ex. E.)

The relevant terms of the "Insuring Agreement" (Section I of the parties' storage

tank insurance agreement) provide:

2

A.  [Colony] will pay, in excess of the Deductible shown in the
Declarations, those sums the insured becomes legally obligated to pay as:

    1.  "corrective action costs", and

    2. "bodily injury" or "property damage"
    because of a "confirmed release" of a "petroleum product" from a
    "storage tank system" at a "scheduled facility" to which this
    insurance applies.
               . . .

C.  This insurance applies only if:

    1.  The "confirmed release" emanates from a scheduled "storage
    tank system" at a "scheduled facility";

    2.  The "confirmed release" first commences subsequent to the
    Policy effective date or retroactive date, if applicable; and

    3.  The "confirmed release" is reported in writing to [Colony]
    subsequent to the effective date and prior to the expiration date of
    the Policy or Extended Periods, if applicable.
               . . .

"Corrective Action Costs" means expenses to evaluate, analyze, remedy,
remove, abate, neutralize or monitor a "Confirmed Release."

"Confirmed Release" means a "Release" that has been investigated and
confirmed by or on behalf of the insured by performing a "Storage Tank
System" tightness test or site check in accordance with 40 CFR § 280.52
or other applicable state regulation or statute.

(Def.'s Mot. Br. Ex. E at Form EO14 BASIC (12/00).)

The parties' agreement to limit the "Insuring Agreement" Section I to the terms

contained in Form EO14BASIC ("Confirmed Release Coverage") altered only Section I

and expressly provides that "ALL OTHER TERMS AND CONDITIONS OF THE POLICY

REMAIN UNCHANGED."  (*Id.*)  Other relevant policy terms provide:

IV.  LIMITS OF INSURANCE

[Colony's] total liability for all "claims" first reported to the Company during
the "policy period" and the Basic and Supplemental Extended Reporting

Periods, if applicable, shall not exceed the Limit of Insurance shown in the
Declarations as applicable to the Aggregate Policy Limit of Insurance.

. . .

V.  DEFINITIONS

B.  "Claim" means:
1.  Under Insuring Agreement A.1., written notice to the
Company during the "policy period" of a "release" of a
"petroleum product" from a scheduled "storage tank system"
at a "scheduled facility" . . . .

. . .

G.  "Policy period" means the period shown as such in the
Declarations, unless earlier canceled pursuant to Article IX,
CONDITIONS, G. of this Policy.

. . .

IX.  CONDITIONS

. . .

G.  Cancellation and Non-Renewal:  This Policy may be canceled
by the First Named Insured by surrender thereof to the Company or
by mailing to the Company written notice stating when thereafter
the cancellation shall be effective.  This Policy may be canceled by
the Company by mailing by Certified Mail Return Receipt
Requested a written notice to the First Named Insured at the
address shown in the Policy.  The effective date of such
cancellation shall be not less than 60 days (ten days for non-
payment of premium) following receipt of the notice of cancellation
by the First Named Insured.  The time of surrender or the effective
date of cancellation stated in the notice shall become the end of the
"policy period."

(*Id.* at PP (07/01 pages 2, 3, and 7).)

The parties' agreement also contains a "Notice of Claim" provision that requires

the insured to provide written notice to Colony "as soon as practicable."  It provides:

The insured shall provide written notice to the Company as soon as
practicable following any "claim" or any event which the insured shall have
reason to believe might result in a "claim."  The insured shall also include
in such written notice details of the "release" or event.

4

The insured shall notify [Colony] in writing of any of the following:

    1.  Any "claim" or suit made against or received by the insured;

    2.  Any action or proceeding which may impose a legal obligation on the inusred for a "claim;"

    3.  Any conditions, events, or circumstances that may give rise to a "claim" that, if first reported to the Company during the"policy period," may be covered by this Policy; or

    4.  Any conditions, events or circumstances for which notification to any governmental agency is required.

(*Id.* at PP (07/01) (page 5 of 7).)

The policy also "does not apply to . . . [a]ny 'release' known to the insured prior to the

effective date of the policy period."  (*Id.* at PP (07/01) (page 3 of 7, Exclusions).)

Lastly, the policy contains an "Extended Reporting Periods" provision that states:

In the event this Policy is cancelled or non-renewed by the Named Insured or the Company, the Named insured may be entitled to the following extensions of coverages.

A.  Basic Extended Reporting Period

    1.  A Basic Extended Reporting Period is automatically provided without additional charge.  This period starts with the end of the "policy period" and lasts for 180 days.  This extension of coverage does not apply if coverage for the "claim" seeking "corrective actions costs" or damages because of "bodily injury" or property damage" is provided by other insurance.
                    . . .

However, there shall be no entitlement to these extensions if coverage is terminated due to the Named Insured's non-payment of the premium or Deductible or for failure to comply with the terms and Conditions of the Policy.

(*Id.* at PP (07/01) at page 7.)

**B.  Plaintiff's Financing & Cancellation of the Policy**

To pay the storage tank insurance premium, ABO entered into a financing contract with Premium Financing Specialists, Inc. ("PFS"), a Missouri corporation.  (*See* Def.'s Mot. Br. Exs. F & G.)  Under the PFS-ABO financing agreement, PFS agreed to pay Colony the insurance premiums and took a security interest in unearned premiums while ABO agreed to repay PFS with interest on a fixed repayment schedule.  (*Id.* at Ex. F.)  As part of the written finance agreement, Plaintiff irrevocably provided PFS with the power to cancel the policy in question.  (*Id.*)

On June 6, 2003, PFS sent to Colony written notice of cancellation of Plaintiff's storage tank policy because Plaintiff failed to pay under the terms of the PFS-ABO installment finance agreement.  The cancellation was effective June 9, 2003.  The notice sent to Colony provides, "You are notified that [the policy at issue] listed below [is] cancelled for non-payment of an installment in accordance with the conditions and terms of the Premium Finance Agreement which incorporates a power of attorney.  This cancellation is effective on the date indicated below . . . ."  (*Id.* at Ex. G.)  The cancellation notice also states: "TO THE INSURER: The polices listed above are HEREBY CANCELLED by PFS on behalf of the insured in accordance with the authority given us by the insured to cancel the polices upon default in his payment to PFS.  The above insured and the producer(s) listed herein have been notified by ordinary mail of this cancellation."  (*Id.*)  Plaintiff acknowledges that it paid the premium installment only after being notified that it had missed a payment, (Pl.'s Resp. at ¶ 5), and does not otherwise contest the validity of PFS's authority to cancel the policy at issue upon Plaintiff's failure to make a payment.

6

**C.  Discovery of Gasoline, Reporting, and Reinstatement of the Policy**

In March 2003, ABO negotiated to sell its service station business at 19036 Dix Street to an individual named Nabil Rahal.  (Pl.'s Mot. Ex. 3.)  The potential buyer hired an environmental consulting firm to conduct an environmental investigation of the property which led to the discovery of gasoline in a monitoring well.  The release of free product (gasoline) at the site was first noticed by ABO on June 12, 2003.  (*See* Pl.'s Mot. Br. Ex. 4; Def.'s Mot. Br. Exs. A & B.)  The discovery of the free product was reported to the Michigan Department of Environmental Quality, Waste and Hazardous Materials Division by submission of a "release report" on June 13, 2003.  (*Id.*)  The Michigan DEQ release report indicated that the cause of the release was unknown. (*Id.*)

Plaintiff used a sump pump to remove the free product and contaminated water and conducted a tank tightness test.  (Def.'s Mot. Br. Ex. C.)  On June 14, the storage tanks and lines passed a tightness test performed by Airsafe, Inc. Environmental Services.  (*Id.*)  Plaintiff also contracted with Advanced Engineering Solutions, Inc. ("AES") to conduct a "Limited Phase II Environmental Site Assessment" for its station at 19036 Dix Street.  AES prepared a written report of its assessment on July 14, 2003. (*Id.* at Ex. D.)  As part of its assessment, AES collected sub-surface soil samples. These soil boring samples "were submitted to a commercial laboratory for chemical analysis of target petroleum/oil constituents to determine the possibility of impact to the Property."  (*Id.* at 1, 5.)  The results of the soil analysis indicated concentration of Benzene, Toluene, Ethylbenzene and Xylene isomers (BTEX) in excess of certain specified levels.  (*See id.* at 6, 14-15.)

7

On June 16, 2003, just days after discovering the release of gasoline into the environment, PFS mailed to Defendant a "Notice of Request for Reinstatement" of the storage tank policy previously cancelled on June 9, 2003.  (*Id.* at Ex. H.)  PFS's request for reinstatement of the policy stated that the original cancellation was based on the insured's default under their financing agreement and that the insured's account was now current.  It also acknowledged that "[o]nly the insurance company can reinstate cancelled policy(s)."  (*Id.*)

The storage tank policy was reinstated on June 16, 2003; however, Plaintiff presents no evidence to contradict Colony's evidence that ABO first notified the insurance company of the release on July 15, 2003, approximately one month after the release of gasoline was first discovered by the insured on June 12, 2003.  (*See* Def.'s Mot. Br. Ex. I; Pl.'s Resp. at ¶ 6.)  The "General Liability Notice of Occurrence/Claim" was dated July 15, 2003.  (Def.'s Mot. Br. Ex. I.)  In addition, it listed the date of the occurrence as July 14, 2003, not June 12, 2003.  (*Id.*)  The description of the occurrence stated: "Insured was informed by environmental company that there may be a recent release.  Tightness test done last month showed system tight.  No notice of loss of product by insured."  (*Id.*)

On July 30, 2003, Colony issued ABO a reservation of rights letter indicating that in order for coverage for "corrective action costs" to apply under the policy, there must be a "confirmed release" of a petroleum product from a storage tank system that first emanates after the effective date of the policy and prior to the expiration date of the policy or an extended reporting period.  (*Id.* at Ex. J.)

8

Colony also presents a document recording the receipt of a telephone call from the insured's attorney on August 20, 2003.  (*Id.* at Ex. K.)  The notation reflects that ABO's attorney initially suggested that there was an incident in March 2003 where someone backed into a pump and that this may have caused a small spill.  (*See id.*)  The employee making the entry also noted that the attorney was asked "(1) why didn't the insured report a claim, (2) why did the inured notify the Michigan DEQ, (3) why didn't he make a claim against the fault party, [and] (4) can insured document how much fuel, if any was lost?"  (*Id.*)[1]

Colony eventually determined that there is no coverage under the policy for loading or unloading of any motor vehicle or a release that arises out of repeated or continuous release commencing prior to the retroactive date of the policy.  (*Id.* at Ex. L.)  In addition, Colony determined that the insured had failed to demonstrate the existence of a "confirmed release" under the terms of the insurance policy.  Colony conveyed this decision to Plaintiff ABO in an October 8, 2003 letter.  (*Id.*)

On March 23, 2004 Youseff Bakri, the general manager for ABO, was examined under oath.  He testified that when Plaintiff acquired the gas station in 1997 no environmental testing was done.  (*Id.* at Ex. N.)  Nor was any testing conducted from 1997 through 2003.  (*Id.*)  Bakri stated that no environmental consultant had advised him of the specific source of the release and that the consultants had not concluded that the contamination emanated from the vehicle collision with a pump in March 2003.  (*Id.*)  He also stated that there was no indication of a loss in inventory in March 2003 and that

---

[1] Plaintiff no longer argues that a March 2003 vehicle accident was the cause of the release.  (Pl.'s Resp. at 8.)

9

a loss of 150 gallons would be significant.  (*Id.*)  Another tank tightness test was

performed in January 2004.  This test did not identify any leaks in the system.  (*Id.* at

Ex. O.)  The parties could not resolve their differences and Plaintiff filed the current

lawsuit on May 11, 2004.

## II. DEFENDANT'S MOTION FOR LEAVE TO ASSERT KNOWN RISK AND/OR LOSS OF PROGRESS DOCTRINES UNDER FED. R. CIV. P. 15(a)

As an initial matter, the court will consider Defendant's "Motion to Amend

Scheduling Order and For Leave to File Second Amended Answer."  In this motion,

Defendant seeks permission to amend its answer to add allegations that the "loss-in-

progress" and "known risk" doctrines preclude coverage under the policy.  The court's

scheduling order established September 1, 2004 as the deadline for amendments to the

pleadings and Defendant states that it did not discover the facts supporting these

defenses until October 2004.  Defendant argues that good cause supports its motion

while Plaintiff argues that Defendant has not been diligent in discovering the factual

predicate for these defenses.  Plaintiff also claims that it will suffer actual prejudice if the

court were to grant Defendant leave to add these defenses at this stage of the litigation.

Federal of Civil Procedure 15 states that leave to amend pleadings "shall be

freely given when justice so requires."  Fed. R. Civ. P. 15(a).  The Supreme Court has

described the mandate of Rule 15(a) as follows:

> In the absence of any apparent or declared reason--such as undue delay,
> bad faith or dilatory motive on the part of the movant, repeated failure to
> cure deficiencies by amendments previously allowed, undue prejudice to
> the opposing party by virtue of allowance of the amendment, futility of the
> amendment, etc.--the leave sought should, as the rules require, be "freely
> given."

10

*Foman v. Davis,* 371 U.S. 178, 182 (1962).  Whether leave to amend should be given remains within the sound discretion of the district court, but the court must announce the reasons for its determination.  *See id; Leary v. Daeschner,* 349 F.3d 888, 905 (6th Cir. 2003).

Pursuant to Rule 16(b) of the Federal Rules of Civil Procedure, "the district judge . . . shall after receiving the report from the parties under Rule 26(f) . . . enter a scheduling order that limits the time . . . *to amend the pleadings.*"  Fed R. Civ. P. 16(b) (emphasis added).  This Rule "is designed to ensure that 'at some point the parties and the pleadings will be fixed.'" *Leary*, 349 F.3d at 906 (quoting the 1983 advisory committee notes).  Further, a district court should permit a modification to the scheduling order only "upon a showing of good cause."  Fed. R. Civ. P. 16(b).

This court has also directed the parties to avoid "shotgun" pleading of claims and defenses in order that the issues for litigation may be narrowed and to minimize discovery costs associated with requiring the parties to plead a laundry list of affirmative defenses or claims.  The relevant provision of the court's June 10, 2004 order states:

> AVOIDING "SHOTGUN" PLEADING OF CLAIMS AND DEFENSES.  The court seeks to streamline cases and narrow issues.  *See* Fed. R. Civ. P. 16(c)(1) ("[T]he court may take appropriate action, with respect to the formulation and simplification of the issues, *including the elimination of frivolous claims and defenses."* (emphasis added)).  In the interest of narrowing the issues and minimizing costs of discovery, counsel are ORDERED to carefully review all claims, all named parties, and all affirmative defenses and are urged to withdraw, without prejudice, any that are not presently sustainable under Rule 11 in view of evidence on hand.

(06/06/04 Order at 3-4.)

In a footnote, the court specifically noted its "practice to grant leave to amend 'freely when justice so requires' under Rule 15(a) to a diligent party who only later

11

acquires facts needed to state a claim or defense under Rule 11." (*Id.* at n.7.)

Here, the court finds good cause and will permit Defendant to assert the "known risk" and "loss-in-progress" defenses. Notwithstanding the fact that Plaintiff first became aware of a gasoline release on June 12, 2003, the record evidence shows Plaintiff's insurance claim report identified the occurrence date for the release of gasoline as July 14, 2003. (*See* Def.'s Mot. Br. at Ex. I.) The court agrees with Defendant in that there did not appear to be a lack of coverage issue with regard to the policy because the policy had been reinstated on June 16, 2003, prior to Plaintiff's asserted occurrence date of July 14, 2003. There existed no obvious reason for Defendant to suspect that the loss was actually discovered by Plaintiff during a period of no coverage. Had Plaintiff truthfully identified and disclosed its discovery date of the gasoline, Defendant would have been on notice to research and add these additional defenses. Such was not the case, and the court finds that good cause exists. In addition, the court is not persuaded that Plaintiff will suffer actual prejudice. Plaintiff has failed to identify the exact nature of this prejudice; nor has it identified any specific additional discovery that it would need to address these two defenses. In fact, Plaintiff is in the best position to know if it had knowledge of a known risk or a loss-in-progress when it reported the release to Defendant. The court will grant Defendant's motion to amend and permit Colony to assert a "known risk" and "loss-in-progress" defense.[2] The court now turns to the parties' competing summary judgment motions.

---

[2] The court also notes that during oral argument, the parties acknowledged that the amendment to add these defenses might be rendered moot in the event that the policy's basic extended reporting period applies to Plaintiff's policy in effect prior to its cancellation by PFS.

12

### III.  SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  "Where the moving party has carried its burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record construed favorably to the non-moving party, do not raise a genuine issue of material fact for trial, entry of summary judgment is appropriate."  *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).

Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  The existence of some factual dispute, however, does not defeat a properly supported motion for summary judgment; the disputed factual issue must be material.  *See id* at 252 ("The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict-'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed.'").  A fact is "material" for purposes of summary judgment when proof of that fact would have the effect of establishing or refuting an essential element of the claim or a defense advanced by either party.  *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984).

13

In considering a motion for summary judgment, the court must view the facts and draw all reasonable inferences from the admissible evidence presented in a manner most favorable to the nonmoving party.  *Wexler v. White's Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).  The court does not weigh the evidence to determine the truth of the matter, but determines if the evidence produced creates a genuine issue for trial. *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003).

## IV.  DISCUSSION

### A.  Michigan Contract Law

The parties agree that Michigan law governs their insurance dispute.  Under Michigan law, the rules for construction of an insurance contract are the same as for any other written contract.  *Comerica Bank v. Lexington Ins. Co.*, 3 F.3d 939, 942 (6th Cir. 1993) (citing *Hall v. Equitable Life Assurance Society*, 295 N.W. 204 (Mich. 1940)). Language in an insurance contract "is to be given its ordinary meaning unless it is apparent from a reading of the whole instrument that a different or special meaning was intended."  *Id.*  An insurance policy should be construed according to the well-settled principles of contract construction.  *See McKusick v. Travelers Indem. Co.*, 632 N.W.2d 525, 528 (Mich. Ct. App. 2001).

"An insurer is free to define or limit the scope of coverage as long as the policy language fairly leads to only one reasonable interpretation and is not in contravention of public policy."  *Heniser v. Frankenmuth Mut. Ins. Co.*, 534 N.W.2d 502, 505 (Mich. 1995).  However, "[w]hen the language in an insurance contract is subject to more than one reasonable interpretation, it is considered ambiguous."  *Farmers Ins. Exch. v.*

14

*Kurzmann*, 688 N.W.2d 199, 204 (Mich. Ct. App. 2003). "An insurance policy must be read as a whole in order to discern and effectuate the intent of the parties." *Id.* at 203.

When interpreting insurance contracts, the court must first determine if the policy language is ambiguous. *Harvey Oil Co. v. Federate Mutual Ins. Co.*, 61 F.3d 903, 1995 WL 431010, at *2 (6th Cir. July 20, 1995) (citing *Ray Indus. v. Liberty Mut. Ins. Co.*, 974 F.2d 754, 759 (6th Cir. 1992)). If the language is unambiguous the court must enforce the terms as written. *Ray Indus. v. Liberty Mut. Ins. Co.,* 974 F.2d 754, 759 (6th Cir. 1992).

An insurance contract is ambiguous if its language can reasonably be understood in differing ways**.** *Farm Bureau Mut. Ins. Co. v. Blood*, 583 N.W.2d 476, 478 (Mich. Ct. App. 1998). Ambiguity is determined only after reading the contract as a whole. *Id.* The fact that a policy does not define a relevant term does not render the policy ambiguous. A reviewing court must interpret terms of the contract in accordance with their commonly used meanings. *Henderson v. State Farm Fire and Cas. Co.*, 596 N.W.2d 190, 193-94 (Mich. 1999); *Group Ins. Co. of Michigan v. Czopek*, 489 N.W.2d 444, 447 (Mich. 1992). When the contract is unambiguous, the meaning and intent of the contract language shall be given full effect. *St. Paul Fire & Marine Ins. Co. v. American Home*, 514 N.W.2d 113 (Mich. 1994).

"It is well-established that an insured [such as ABO] has the initial burden of proving that its losses fall within the scope of the policy's insuring agreement." *Detroit Water Team Joint Venture v. Agricultural Ins. Co.*, 371 F.3d 336, 339 (6th Cir. 2004) (citing *Esicorp, Inc. v. Liberty Mut. Ins. Co.*, 266 F.3d 859, 864 (8th Cir. 2001) and applying Michigan law).

15

**B.  Cancellation of the Policy & "Known Risk" and "Loss in Progress" Doctrines**

Under Michigan law, "insurance provides coverage for fortuitous events only."

*CPC Int'l Inc. v. Aerojet-General Corp.*, 825 F. Supp. 795, 809 (W.D. Mich. 1993) (citing

*Nash v. New York Life Ins. Co.*, 262 N.W. 441 (Mich. 1935)).  "No coverage exists for

events that must happen or that have happened."  *Id.*  As the Michigan Supreme Court

noted in *American Bumper v. Hartford Ins.*, 550 N.W.2d 475, 484 (Mich. 1996),

"Michigan recognizes that a completed loss is not covered under an after-acquired

insurance policy."

The "known risk" doctrine has been described as follows:

> "The known [risk] doctrine is a common law concept that derives from the
> fundamental requirement of fortuity in insurance law."  *Pittston* [*Co.
> Ultramar America Ltd v. Allianz Ins., Co.*]*,* 124 F.3d at 516.  Its basic
> premise is that insurance policies are intended to protect insureds against
> risks of loss; not losses that have already taken place or are substantially
> certain to occur.  Accordingly, the doctrine is properly invoked when the
> insured "knows" about the claimed loss before the policy is purchased.

*Aetna Cas. & Sur. Co. v. Dow Chemical Co.*, 10 F. Supp. 2d 771, 789 (E.D. Mich.

1998).  Another Michigan federal district court has noted that Michigan courts have

applied this common law doctrine in a pollution setting.  *CPC Int'l Inc.*, 825 F. Supp. at

809.  The *CPC* court stated:

> In a pollution setting, several Michigan courts have held that a loss was
> uninsurable when it was a "known risk," that is, when the insured knew or
> should have known that there was a substantial probability of loss before
> the contract period began.  *See Mitchell v. Ins. Co. of North America,* No.
> 86- 51880-CK (Kent Cty. Cir.Ct. Nov. 11, 1988), in which the court
> specifically embraced the "known-risk" doctrine as part of Michigan law.
> *See also County of Kent v. Home Ins. Co.,* No. 85-46740-CK (Kent Cty.
> Cir.Ct. Apr. 3, 1990); *Central Quality Services Corp. v. Ins. Co. of North
> America,* No. 87- CV-74473-DT, slip. op. (E.D.Mich. Sept. 6, 1989)
> (*Central Quality I* ), *aff'd,* 977 F.2d 580 (6th Cir.1992) (*Central Quality II* );
> *Inland Waters Pollution Control, Inc. v. National Union Fire Ins. Co.,* 783
> F.Supp. 325, 329 (E.D. Mich. 1992).

16

. . .

> "For the known risk doctrine, the relevant question is whether the insured knew or reasonably should have known there was substantial probability of a loss before a policy period began."  If such probably exists, then the risk is known and cannot be insured against."  *Central Quality Services Corp. v. Ins. Co. of North America*, No. 87-CV-744-DT, slip op. at 29, n.13 (E.D. Mich. Sept. 6, 1989) (*Central Quality I*), *aff'd*, 977 F.2d 580 (6th Cir. 1992) . . . .

*Id.*

"[T]he 'loss in progress' doctrine, as a variant of the 'known loss' doctrine, has its roots in the prevention of fraud.  Because insurance policies ... are designed to insure against fortuities, a fraud is worked when they are misused to insure a certainty."  *Inland Waters Pollution Control v. National Union Fire Ins. Co.*, 997 F.2d 172, 179 (6th Cir. 1993) (applying Michigan law); *see also Aetna Casualty & Surety Co.*, 10 F. Supp. 2d at 789.  This doctrine has been described "as a fundamental principle of insurance law." *Inland Waters*, 997 F.2d at 178.

Under the "loss-in-progress" doctrine, "no part of a loss may be insured when it was already in progress before the contract period, that is, when the damage for which coverage is claimed began before the contract period and continues into the contract period."  *CPC Int'l*, 825 F. Supp. at 809.  The loss-in-progress doctrine "requires foreknowledge of loss or an awareness of an immediate threat of loss on the part of the insured" at the time the policy is obtained (i.e. purchased or reinstated).  *Inland Waters*, 997 F.2d at 179; *Aetna Casualty & Surety Co.*, 10 F. Supp. 2d at 789.

Although the Michigan Supreme Court has yet to expressly adopt these common law doctrines, *see American Bumper*, 550 N.W.2d at 484, the Sixth Circuit has predicted that the Michigan Supreme Court would recognize the "loss-in-progress" doctrine. *Inland Waters,* 997 F.2d at 175; *see also South Macomb Disposal Auth. v. American*

17

*Ins. Co.*, 572 N.W.2d 686, 704-05 (Mich. Ct. App. 1997) (applying doctrine as described in *Inland Waters*).  The *Inland* court also noted that the "loss-in-progress" doctrine is merely a variant of the "known risk" doctrine and other courts have held that the Michigan Supreme Court would also apply the "known risk" doctrine.  *See CPC Int'l*, 825 F. Supp. at 810, 811 ("[T]he court in *Inland Waters* adopted both of these doctrines for the following reasons: the weight of authority of other jurisdictions; the indications within the state of Michigan that these doctrines would be acceptable; and the court's belief that the Michigan Supreme Court, if presented with this question, would adopt these doctrines into law."); *Aetna*, 10 F. Supp. 2d at 789-90.  This court agrees that the Michigan Supreme Court would apply these doctrines in the insurance law setting.

Plaintiff has not presented evidence to contradict Defendant's evidence which shows that PFS, as Plaintiff's agent, cancelled the storage tank insurance policy, effective June 9, 2003.  It is undisputed that Plaintiff learned of the gasoline spill or "release" on June 12, 2003, reporting it to the Michigan DEQ the following day.  There is also no evidence to rebut the fact that Plaintiff's storage tank policy was reinstated upon request from Plaintiff or its agent on June 19, 2003.  Plaintiff, however, did not notify Colony of the release allegedly covered by the insurance policy until mid-July 2003.

The only conclusion that a reasonable jury could reach from the evidence presented is that Plaintiff knew about the contamination before it requested reinstatement and that it failed to inform Defendant until weeks after the cancelled policy was reinstated.  The record establishes that the loss in this case had already occurred or was in progress, Plaintiff knew about the loss, and sought reinstatement (starting a new policy period) without notifying the insurance company of the loss.  As such, the

18

"known-risk" and "loss-in-progress" doctrines bar Plaintiff from seeking to recover under the policy as it applied post-reinstatement.

The court is not persuaded by Plaintiff's argument that these doctrines do not apply because the original policy had already issued and Plaintiff had already *purchased* the policy.  It is important to note that the facts at hand create two distinct and separate policy coverage periods.  The first spans from January 14, 2003 through June 9, 2003, the effective date of Plaintiff's cancellation.  The second spans from the date of reinstatement, June 16, 2003, through the original end date for the policy, January 14, 2004.  Plaintiff argues that "this is not a case where Plaintiff discovered contamination at its site and then purchased the insurance policy."  (Pl.'s Resp. at 9.)  The policy, however, was cancelled effective June 9, 2003, ending the policy period.  (*See* Def.'s Mot. Br. Ex. E. ("Policy period" means the period shown as such in the Declarations, unless earlier canceled pursuant to Article IX, CONDITIONS, G. of this Policy.").)  Plaintiff identifies no contractual provision that would make its later reinstatement retroactive in order to cover gaps in coverage caused by the cancellation.

A reinstatement, just like an initial purchase, begins a new policy period.  Under the "loss-in-progress" doctrine "no part of a loss may be insured when it was already in progress before the contract period, that is when the damage for which coverage is claimed began to occur before the contract period and continues into the contract period."  *CPC Int'l*, 825 F. Supp. at 809.

The court also rejects Plaintiff's argument that the cancellation by PFS was not effective because it failed to comport with certain notice provisions.  Plaintiff argues that Defendant failed to comply with the notification requirements in its Certificate of

19

Insurance and under Section IX. G. of the parties' contract.  The language relied on by

Plaintiff states:

> Cancellation or any other termination of the insurance by the insurer,
> except for non-payment of premium or misrepresentation by the insured,
> will be effective only upon written notice and only after the expiration of 60
> days after a copy of such written notice is received by the insured.
> Cancellation for non-payment of premium or misrepresentation by the
> insured will be effective only upon written notice and only after expiration
> of 10 days after a copy of such written notice is received by the insured.

(Pl.'s Mot. Br. Ex. 2 (Certificate of Insurance).)

Plaintiff claims that under the terms of the Certificate of Insurance, cancellation of

the policy should not have been effective until 10 days after it received written notice of

cancellation.  (Pl.'s Resp. at 10.)  However, this language and the policy language in

Section IX G., including the 10-day written notice provision, apply to a "cancellation or

any other termination of the insurance *by the insurer.*"  (Pl.'s Mot. Br. Ex. 2 (Certificate

of Insurance) (emphasis added); Def.'s Mot. Br. Ex. E at IX. G.)

Here, Colony did not cancel the insurance.  Rather, Plaintiff cancelled the policy

through its agent, PFS.  Defendant also notes the statutory requirement under Michigan

law that requires all casualty insurance polices to have a provision that permits the

insured to immediately cancel policies without notice in order to recover unearned

premiums.  *See* Mich. Comp. Laws § 500.3020(1)(a) ("A policy of casualty insurance . .

. shall not be issued or delivered in this state by an insurer . . . for which a premium or

advanced assessment is charge, unless the policy contains the following provisions:

That the policy may be canceled at any time at the request of the insured, in which case

the insurer shall refund the excess of paid premium or assessment above the pro rata

rates for the expired time ....")

Plaintiff correctly notes that the "known risk" and "loss in progress" doctrines do not apply to the initial policy coverage period from January 14, 2003 through June 9, 2003. The loss at issue post-dates ABO's initial purchase of the storage tank liability policy. Accordingly, the court turns to whether Plaintiff may recover "corrective action costs" under this initial period of policy coverage (i.e. from purchase to cancellation by PFS).

**C. Whether there is Coverage Under the Policy Period Before Cancellation**

**1. Applicability of Extended Reporting Period**

Defendant argues that there can be no coverage under the policy from January 14, 2003 through June 9, 2003 because Plaintiff failed to report the alleged loss during a period of coverage. Defendant notes that the policy is a "claims made" policy and for coverage to apply, the loss must occur and be reported during a period of coverage. Here, the claim was not made until July 2003, after the policy period ended on June 9, 2003. Defendant argues that even if Plaintiff had reported the release to it on June 12, 2003, the claim would have been denied for not reporting the occurrence within a period of coverage.

Defendant's argument, however, does not address the "Extended Reporting Periods" provisions in the parties' insurance agreement. Defendant offers no explanation for why the language at Section X A.1 of the policy does not extend to Plaintiff's July 2003 claim. As noted above, the policy provides a basic extended reporting period. The relevant language states:

> In the event this Policy is cancelled or non-renewed [sic] by the Named Insured or the Company, the Named insured may be entitled to the following extensions of coverages.

21

A.  Basic Extended Reporting Period

> 1.  A Basic Extended Reporting Period is automatically provided without additional charge.  This period starts with the end of the "policy period" and lasts for 180 days.  This extension of coverage does not apply if coverage for the "claim" seeking "corrective actions costs" or damages because of "bodily injury" or property damage" is provided by other insurance.
>
> . . .
>
> However, there shall be no entitlement to these extensions if coverage is terminated due to the Named Insured's non-payment of the premium or Deductible or for failure to comply with the terms and Conditions of the Policy.

(*Id.* at PP (07/01) at page 7.)

The policy language excluding the extended reporting period "if coverage is terminated due to the Named Insured's non-payment of the premium" does not unambiguously apply to Plaintiff.  Defendant acknowledges that it was paid the entire premium in advance by Plaintiff's agent PFS.  As such, the company cannot rely on this language to argue that Plaintiff's own cancellation was a termination due to the non-payment *of the premium*.  The non-payment of premium referred to in this contract provision does not relate to Plaintiff's independent financing agreement.  The court cannot determine that Plaintiff's claim under the first period of coverage was untimely as a matter of law; in fact the language suggests that it was timely because it was filed within 180 days after the date of the policy cancellation under the basic extended reporting period contained in the parties' agreement.[3]

_____

[3] During oral argument on March 9, 2005, the court asked Defendant's counsel whether the basic extended reporting provision in the policy would apply to Plaintiff's claim. Defendant's counsel initially expressed a desire to examine that issue and to file a supplemental brief.  Later, however, Defendant's counsel relented and has elected not to file a brief challenging the applicability of the basic extended reporting provision.

22

### 2.  Whether Plaintiff Notified Defendant "As Soon As Practicable"

Defendant argues that it is entitled to summary judgment because Plaintiff breached the "Notice of Claim" provision, by failing to provide written notice of the event giving rise to the claim "as soon as practicable."  (Def.'s Mot. Br. Ex. E (Insurance Policy Section VIII).)

This issue is the subject of supplemental briefs which the court permitted the parties to file after the hearing.  Plaintiff filed its "Supplemental Brief on the Issue of Notice to Defendant . . ." on March 21, 2005 and Defendant filed its "Brief in Reply to Plaintiff's Supplemental Brief on the Issue of Notice" on March 29, 2005.

The purpose of notice provisions under Michigan insurance law "is to allow insurers to make timely investigations of accidents, to evaluate claims and to defend against fraudulent, invalid, or excessive claims."  *CPC Int'l*, 825 F. Supp. at 813 (citing *Wendel v. Swanberg*, 185 N.W.2d 348 (Mich. 1971)); *see also West Bay Exploration Co. v. AIG Speciality Agencies of Texas, Inc.*, 915 F.2d 1030, 1036 & n.8 (6th Cir. 1990).  Notice provisions "give the insurer an opportunity to investigate the facts and circumstances affecting the question of liability and the extent of such liability."  *Wehner v. Foster*, 49 N.W.2d 87 (Mich. 1951).

The parties dispute whether the evidence would permit a reasonable jury to conclude that Plaintiff in this case provided notice "as soon as practicable" (i.e. within a reasonable amount of time) and whether Michigan law requires a defendant insurance company to establish prejudice stemming from an insured's failure to comply with the notice provision.

"Under Michigan law, late notice to an insurance company will not eliminate an insurer's obligations under a policy unless the insurer can demonstrate that it has been prejudiced by the delay." *West Bay Exploration Co.*, 915 F.2d at 1036 & n.8 (collecting Michigan cases)*; see also CPC Int'l*, 825 F. Supp. at 813 ("Unless an insurer can show that it has suffered prejudice because of a delay, however, late notice to an insurance company of a possible claim does not eliminate an insurer's obligations under a policy.").  The burden to show prejudice from untimely notice rests on the insurer and prejudice will be found to exist where the delay "materially" impairs an insurer's ability to contest its liability to a an insured or third party.  *See West Bay*, 915 F.2d at 1036-37. "In determining whether an insurer's position has actually been prejudiced by the insured's untimely notice, courts consider whether the delay has materially impaired the insurer's ability: (1) to investigate liability and damage issues so as to protect its interests; (2) to evaluate, negotiate, defend, or settle a claim or suit; (3) to pursue claims against third parties; (4) to contest the liability of the insured to a third party; and (4) to contest its liability to its insured."  *Aetna Cas. & Sur. Co.,* 10 F.Supp.2d at 813.  "An insurer must do more than simply claim that evidence was lost, physically altered, or has otherwise become unavailable and that witnesses have died, disappeared, or their memories have faded. It must establish what is in fact lost by the missing evidence, how this prejudices its position, and why information available from other sources is inadequate."  *Id.* at 813-14 (citing *Kennedy v. Dashner,* 319 Mich. 491, 494, 30 N.W.2d 46 (1947)).

Michigan law does not require that an insurer prove that but for the delay it would have avoided liability and denying the insurer the option of suggesting or mandating the

use of less costly or more efficient cleanup procedures may constitute prejudice. *Id.* Michigan courts generally leave the question of prejudice to the trier of fact, but where the facts permit only one reasonable conclusion the question is one of law. *CPC Int'l*, 825 F. Supp. at 813 (citing *Wendel*, 185 N.W.2d at 384); *West Bay*, 915 F.2d at 1037 ("While the question of prejudice is generally to be left to the trier of fact ... where the facts are so clear that 'one conclusion only is reasonably possible,' the question is one of law.") (citations omitted).

Policy language requiring notice "as soon as practicable" has been interpreted in this context to mean within a reasonable time, dependent on the particular circumstances of each case. *Motor State Ins. Co. v. Benton*, 192 N.W.2d 385, 387 (Mich. Ct. App. 1971); *Kravat v. Indemnity Ins. Co.*, 152 F.2d 336, 337-38 (6th Cir. 1945).

In its supplemental brief, Defendant argues that it need not establish prejudice because Michigan case law requires prejudice in third-party liability claim cases only (i.e. where there is an injured third party). Defendant claims that "there is no case law in Michigan on point in a first party claim for reimbursement of costs for nonmandatory insurance." (Def.'s Supp. Br. at 3.) Plaintiff argues that the weight of case law requires Defendant to establish specific prejudice to trigger non-compliance with the notice provision as a bar to its claim. Binding Sixth Circuit precedent governs in this case.[4]

---

[4] Because the 180-day basic extended reporting period applies to Plaintiff's claim, this is not a case where the insured has failed to provide evidence that it provided notice within the "claims made" policy period or as soon as reasonably possible. *See Schubiner v. New England Ins. Co.*, 523 N.W.2d 635 (Mich. Ct. App. 1994).

In *Westbay*, the Sixth Circuit applied Michigan law and held that insurance company defendants had to establish actual prejudice in order to trigger a policy notice provision to bar the plaintiff's claim. *Westbay*, 915 F.2d at 1036-38. Similar to Plaintiff ABO, the plaintiff in *Westbay* was seeking to recover from its insurers for cleanup costs it incurred after a chemical release into the environment. *See id. Westbay* was, like this case, a first party claim and the Sixth Circuit interpreted Michigan law as requiring an insurer to demonstrate actual prejudice to bar a claim for failure to comply with a notice provision. Also like the provision at issue here, the notice provisions in *Westbay* required the inured to provide notice to an authorized agent "as soon as practicable." *Id.* at 1034. The policy language at issue in *Westbay* also expressly stated that "[n]o action shall lie against the [insurance] company unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy." *Id.*

The *Westbay* court did, however, recognize that Michigan case law establishing a general reluctance to permit insurers to escape liability under notice provisions was more significant in third-party liability situations. It explained:

> The plaintiff has accurately noted a general reluctance on the part of the Michigan courts to allow insurers to escape liability due to notice provisions. The cases cited, however, all involve attempts by injured parties to recover in garnishment proceedings against an insurer of a principal defendant. Under these circumstances, the Michigan courts have proceeded with sensitivity to the equities of the cases before them. As the court of appeals stated in *Burgess:*
>
>> In most instances, the practical effect of a ruling in favor of the insurance carrier in a garnishment action leaves the injured plaintiff with an uncollectible judgment, while fairness also dictates that the insurance carrier must not be deprived of an opportunity to protect its interests where it has no notice. Erosion of rights of the insurance carrier adds to the costs of doing business. There exists a delicate balancing of these respective social interests.

26

> Insurance companies are professionals in the arena of litigation.  Hence,
> evolution of the concept that the insurance carrier must show prejudice
> from the lack of notice of accident or suit before it will not be required to
> respond.  107 Mich.App. at 629-30, 310 N.W.2d 23; *see also Wood,* 156
> Mich.App. at 164, 401 N.W.2d 258.  The need for delicate balancing of the
> equities to avoid injury to an innocent third party is absent from this case.
> Here, the plaintiff delayed making a claim on its policies with the
> expressed intention of avoiding an increase in its insurance premiums.
> Having acted in its own financial interest, it cannot now complain because
> it has been injured thereby.

*Id.* at 1038.  The *Westbay* court ultimately ruled that there was no genuine issue of

material fact that the plaintiff failed to provide notice "as soon as practicable" and that

the delays of two and three years in notifying the insurance company defendants

materially prejudiced the defendants as a matter of law.

Here, no reasonable jury could conclude that Plaintiff notified Defendant "as soon

as practicable."  The evidence shows that Plaintiff readily notified the State of Michigan

about the release as required by law within days after discovering the release, yet

waited nearly a month before making a claim with Defendant.  After reporting the

release to the State of Michigan, Plaintiff pumped out at least 1,400 gallons of free

product and water from the well where it was discovered on June 12, 2003.  Plaintiff

proceeded to retain the services of an environmental consultant without notifying

Defendant.  On these undisputed facts, no reasonable jury could conclude that waiting

nearly a month was reasonable.

Plaintiff asserts that its delay could be reasonable because it decided to hire its

own consultant to evaluate whether there was contamination at the station.  (*See* Pl.'s

Supp. Br. at 3.)  Plaintiff claims that it waited a month to determine whether there was

contamination.

This argument is not persuasive.  As Defendant identifies, there is evidence in the form of Uniform Hazardous Waste Manifest reports that shows, by June 17, 2003 (five days after discovering the free product), Plaintiff had pumped 1,000 gallons of free product from the ground.  (*See* Def.'s Supp. Br. Ex. A.)  There is no basis to find that Plaintiff needed approximately one month to determine if there was contamination at the site.  Moreover, the policy provision requires notice of "[a]ny conditions, events or circumstances for which notification to any governmental agency is required."

Although there is no question of fact that Plaintiff did not notify Defendant "as soon as practicable," there remains an issue of fact on whether Defendant has suffered material prejudice caused by Plaintiff's late notice.  Defendant has identified several actions that may potentially cause it prejudice, but has failed to explain how Plaintiff's actions have materially prejudiced its ability to evaluate, negotiate, defend, or settle the claim.  Defendant does not show that Plaintiff's actions caused it material prejudice as a matter of law.  In fact, during oral argument, Defendant's counsel acknowledged that if it had to prove prejudice "that would be a question of fact for the trier of fact."  (03/09/05 Hearing Tr. at 14.)

### 3.  Evidence of a "Confirmed Release" Covered Under the Policy

Notwithstanding the factual issue surrounding the reasonable notice provision of the policy, Defendant is entitled to summary judgment because Plaintiff has failed to present admissible evidence from which a reasonable jury could conclude that the release emanated from the a scheduled storage tank system.

Both parties agree that for coverage to apply, the insured must show: (1) that the release emanated from a scheduled storage tank system; (2) the release is confirmed

28

by a tank tightness test or a site check in accordance with 40 C.F.R. § 280.52 or other applicable state regulation or statute; and (3) the release first commenced after the policy's effective date and prior to the expiration date of the policy or extended reporting periods, if applicable.  (*See* Def.'s Mot. Br. Ex. E (Confirmed Release Coverage Endorsement); Def.'s Mot. Br. at 6; Pl.'s Resp. at 5.)  Because Defendant identifies an absence of evidence to establish coverage, the court's task on a Rule 56 motion is to determine whether Plaintiff has presented sufficient evidence to create a triable issue of fact in this regard.

With regard to whether the release emanated from the covered storage tanks or storage tank system, Plaintiff relies on the testimony of its proposed expert Thomas M. Kinney and that of Defendant's proposed expert Christopher T. Bade.  (Pl.'s Mot. Br. Exs. 9 & 10.)  After stating that there was no continuing release at the site, Mr. Kinney testified as follows:

> Q.  All right.  I'll ask you directly.  What was the cause of the release in this case?
> A.  I guess we don't know a hundred percent sure.
>
> Q.  Do you have an opinion that you would call your professional opinion –
> A.  Sure. Yes.
>
> Q.  – of what the release is and where it was?
> A.  I can't say certainly.  Cannot say with a hundred percent confidence exactly where the release came from.  All I can say is that based on the work we've done, delineating the extent of it, seeing where it is present and where it isn't present, that is did come from the UST system.

(Kinney Dep. at 15.)

Mr. Bade's testimony suggests that the release *could have* come from the storage tank system and fails to identify when.  It provides:

> Q.  Take a look at this report [prepared by CRA]

29

A. I have reviewed this.

Q. Okay. Based on your review of this report and your expertise, does it appear that this release came from this particular underground storage tank system?
A. When you say "tank system," can you be more definitive on that?

Q. I mean the entire system on site.
A. All of what they have?

Q. The tanks, the lines, the pumps, and so forth.
A. Well, based on what I see in their report, I would assume that, yes, this fueling system somewhere along the line has failed. Whether it's the system, whether it's overfills or – but it has to deal with (indicating) the fueling operations of this facility.

Q. You don't have any reason to believe that this product migrated from an adjacent property"
A. No. I don't see that in this.

(Bade Dep. at 35-36.)

Defendant argues that Kinney's conclusion that the release emanated from the UST system is not supported by the evidence because the UST system passed the tightness tests and because he stated that he could not eliminate the possibility that the release was from a source other than the lines or tank No. 4 of the UST system.[5] (*See* Kinney Dep. at 12, 46.) Kinney acknowledges that the UST system at issue passed several tightness tests and he concluded that the system was "a non[-]leaker ... from a regulatory standpoint." (*Id.* at 12.) He did not firmly conclude that the results of the tightness tests ruled out a release from the storage tank system. Neither did he identify evidence showing that the release came from the system. (*See id.*) Kinney admittedly

---

[5] The UST system at issue contains four underground storage tanks and piping beneath a pump island. There are two separate UST tank farms; three tanks are grouped near the south end of the property while the fourth is located on the north end. (*See* Def.'s Mot. Br. Ex. D at Figs. 2 & 3.)

30

could not pinpoint the precise location within the system but opined that the release did

come from the UST system.  Kinney testified as follows:

> Q.  On those diagrams and figures [in the initial assessment report] you
> show Underground Storage Tank No. 4 and had the designation, I believe,
> "release site" there.
> A.  Yes.
> Q.  I'm taking it from what you've described to me now in examination, that
> all you're doing is reporting that the contamination was found in that area;
> you're not saying it actually came from the tank.
> A.  True.  That's the documented release location.  We're not saying that
> the UST No. 4 is exactly where the leakage occurred.
>
> Q.  Okay.  Are you saying that you have eliminated the possibility of
> anything other than a leak from the tank, UST No. 4, as a source of that
> contamination?
> A.  No.
>
> Q  You're not saying that?
> A.  I can't say with 100 percent confident [sic] that's [sic] not from
> overfilling, for instance.

(Kinney Dep. at 46-47 (Def.'s Mot. Br. Ex. P).)

The evidence presented also establishes that approximately 3,000 gallons of

gasoline was released into the environment.  There have been no repairs or

replacement of any component within the storage tank system and there is absolutely

no evidence of a loss of inventory during the policy period in question.  Mr. Youseff

Bakri, the general manager for the station, testified that there was no indication of any

inventory loss noted and that a loss of more than 150 gallons, let alone 3000, would be

significant.[6]  (*See* Bakri Dep. at 25, 32-39.)  Plaintiff's agent's own testimony and logic

---

[6] During oral argument, Plaintiff's counsel suggested that the release could have
resulted from a slow or gradual release from the system over time.  This suggestion,
however, is not supported by any evidence of a "slow leak" or any actual leak in the
system.  Proposing a theory to explain how the release may have originated from the
underground storage system does not satisfy Plaintiff's burden under Rule 56.

dictate that a loss of 3000 gallons from the tank system's inventory would have been noticed.  During argument, the court noted, and Plaintiff's counsel agreed, that the evidence of a loss of 3000 gallons from the storage system necessarily implicates a loss of in inventory.  (03/09/05 Hearing Tr. at 28-29.)  It is also undisputed that two independent storage tank tightness tests revealed no leaks or defects in the system.  Nor is there evidence that the leak detection system was triggered or was inoperable.  As the court noted during oral argument, the evidence "appears to point to the direction and only in the direction that there was no leak, no discernable leak from [underground storage tank 4] or any other tank."  (03/09/05 Hearing Tr. at 28.)

When considering the evidence presented, the court cannot conclude that there is sufficient evidentiary support for a reasonable jury to conclude that the release emanated from the storage tank system.  The unambiguous terms of the policy require Plaintiff to establish that the release emanated from the system.  The policy does not cover releases of unknown origin.  Defendant is entitled to summary judgment.

## V. CONCLUSION

IT IS ORDERED that Defendant's "Motion to Amend Scheduling Order and for Leave to File Second Amended Answer" [Dkt. # 15] and Defendant's "Motion for Summary Judgment" [Dkt. # 16] are GRANTED.

IT IS FURTHER ORDERED that Plaintiff's "Motion for Summary Judgment" [Dkt.

# 18] is DENIED.


 s/Robert H. Cleland
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE


Dated:  April 19, 2005


I hereby certify that a copy of the foregoing document was mailed to counsel of record
on this date, April 19, 2005, by electronic and/or ordinary mail.

 s/Lisa G. Teets
Case Manager and Deputy Clerk
(313) 234-5522